CV 16          4819

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

KUNTZ, J.

GOLD, M.J.

| | |
|---|---|
| [UNDER SEAL], | |
| Plaintiff, | |
| -against- | CIVIL CASE NO. |
| | FILED *IN CAMERA* AND <u>UNDER SEAL</u> |
| [UNDER SEAL], | Jury Trial Demanded |
| Defendants. | |

<u>FALSE CLAIMS ACT COMPLAINT</u>

## DO NOT FILE ON PACER



2016 AUG 29  PM 1: 18

FILED
CLERK

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW YORK, *et rel.* ANA BARBRA ZAYAS and ALEXANDRA ROJAS, | ECF Case |
| **Plaintiff,** | **CLASS &** **COLLECTIVE ACTION** **COMPLAINT** |
| -against- | |
| WILLIAMSBURG PHYSICAL THERAPY P.C., FIRST PLUS SERVICE, INC., EURO PHYSICAL THERAPY, P.C., ALEX KLURFELD and DIANA KLURFELD, | **Jury Trial Demanded** |
| **Defendants.** | |

*Qui Tam* Plaintiffs/Relators Ana Barbra Zayas ("Zayas") and Alexandra Rojas ("Rojas" and, collectively with Zayas, "Plaintiffs" or "Relators"), bring this action against Williamsburg Physical Therapy, P.C. ("Williamsburg"), First Plus Services, Inc. ("First Plus"), Euro Physical Therapy, P.C. ("Euro"), Alex Klurfeld ("A. Klurfeld") and Diana Klurfeld ("D. Klurfeld" and, collectively with Williamsburg, First Plus, Euro and A. Klurfeld "Defendants") on behalf of the United States of America and the State of New York and allege, based upon personal knowledge and relevant documents, as follows:

**NATURE OF THE ACTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America and the State of New York arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendants and/or their agents and employees in violation of the Federal Civil False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* and the New York State False Claims Act ("NY FCA"), NY Fin. Law, ch.

13 §§ 187, *et seq.* for false claims that Defendants presented to Medicare and Medicaid, federal healthcare programs, as defined in 42 U.S.C. § 1320a-7b(f).

2.     This action arises out of false claims for fraudulent billing practices and improper and potentially dangerous patient care performed by Defendants throughout their physical therapy offices located throughout the city of New York.

3.     Since at least 2006, Defendants have been engaging in a scheme to increase Defendants' revenue from Medicare and Medicaid by:

- Improperly billing for work performed by unlicensed physical therapy aides ("Aides") and/or unlicensed physical therapy assistants ("Assistants") without direct supervision of a licensed physical therapist ("PT") as if Medicare and Medicaid licensed physical therapists as if Medicare and Medicaid licensed physical therapists had performed the work;

- Improperly submitting bills containing the unique Medicare and Medicaid provider identification numbers of Medicare and Medicaid licensed physical therapists for services provided by unlicensed Aides or Assistants without direct supervision of a PT;

- Improperly billing Medicare and Medicaid for exercises that patients do not perform;

- Improperly backdating treatment on bills submitted to Medicare and Medicaid in order to receive payment for treatment given after the authorization date; and

- Improperly routinely waiving co-payments for Medicare and Medicaid patients.

4.     Defendants made numerous false claims on documents submitted to Medicare and Medicaid seeking payments based on, or reimbursement for services that were never completed

or were completed by unqualified personnel, including unlicensed Aides or Assistants without the direct supervision of a PT pursuant to Medicare rule 42 C.F.R. § 410.26(b)(1)-(7) and the CMS Medicare Benefit Policy Manual, Pub. 100-4, Ch. 15 § 60.1-§ 60.5[1].

5.     In furtherance of the false claims, Defendants A. Klurfeld and D. Klurfeld instructed Relators Zayas and Rojas and other employees to check for proper (and sometimes forged) PT signatures on physical therapy notes and evaluation forms (notes and evaluations which were sometimes performed by unlicensed Aides and Assistants) and to backdate patients' physical therapy  so that they would be approved for payment by Medicare and Medicaid.

6.     When Relator Zayas refused to engage in these fraudulent practices, Defendants retaliated against her by humiliating her in front of her co-workers, cutting her hours, refusing to grant her paid-time off ("PTO"), and refusing to grant her any raises. As a result, Relator Zayas was forced to leave her employment with Defendants.

7.     When Relator Rojas refused to engage in these fraudulent practices, Defendants retaliated against her by making her work environment uncomfortable, refusing to send her help when she needed it, and harassing her. As a result, Relator Rojas was forced to leave her employment with Defendants.

8.     In perpetrating the above schemes, Defendants have fraudulently obtained reimbursement from public funds.

9.     As a direct result of Defendants' improper practices, federal health insurance programs including, but not limited to Medicare and Medicaid, have paid false or fraudulent

---

[1] In order to bill for outpatient services provided by a PTA, the claim must meet the following conditions: (1) the supervising therapist performs the evaluation and establishes the plan of care; (2) the services the PTA provides are medically necessary; (3) the supervising therapist provides direct onsite supervision (i.e., he or she is in the same building, but not necessarily in the same room); (4) the supervising therapist is immediately available to intervene (i.e., he or she cannot be doing something that is uninterruptable); (5) the supervising therapist has active ongoing involvement in the management and control of the patient's condition; (6) if the patient presents with a new condition, the supervising therapist sees the patient; and (7) the PTA providing the service under the direct onsite supervision of the therapist is an employee or an independent contractor of the practice.

claims as reimbursement for services which were performed by unlicensed individuals, services which were not provided and services which were not authorized by Medicare and Medicaid that would not have been paid but for Defendants' illegal business practices.

10.     As a result of Defendants' fraudulent practices, Defendants have recovered over one-hundred million dollars ($100,000,000.00) over the past ten (10) years. Defendants' fraudulent practices have caused great harm and expense to the federal government and the state of New York and to honest individuals who are receiving improper and unlawful medical care.

11.     Furthermore, Defendants' fraudulent practices have caused physical harm to several of Defendants' patients. Defendants' unlicensed Aides or Assistants have physically burned Defendants' patients with ultrasound hot packs and have left therapy in more pain than they were in when they arrived.

12.     The FCA was originally enacted during the Civil War, and later substantially amended in 1986. Congress amended the FCA to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction and to encourage the private bar to commit legal resources in prosecuting fraud on the Government's behalf.

13.     The FCA provides that any person who knowingly submits, or causes the submission of a false or fraudulent claim to the U.S. Government for payment or approval, is liable for a civil penalty of up to $11,000 for each such claim, plus three (3) times the amount of

damages sustained by the Government. Liability attaches when a defendant knowingly seeks payment, or causes others to seek payment, from the Government that is unwarranted.

14. The FCA allows any person having information about a false or fraudulent claim against the Government to bring an action for both himself and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of sixty (60) days (without service on the defendant(s) during that time), to allow the Government time to conduct its own investigation and determine whether to join suit.

15. Based on these provisions, *qui tam* Plaintiffs seek through this action to recover on behalf of the United States and the State of New York that authorizes similar *qui tam* actions, damages and civil penalties arising from Defendants' making or causing to be made false or fraudulent records, statements and/or claims in connection with its practice of billing Medicare and Medicaid for services which were not performed by licensed physical therapists, billing Medicare and Medicaid for services which were not provided and billing Medicare and Medicaid for services which were unauthorized by Medicare and Medicaid.

## JURISDICTION AND VENUE

16. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3720. Under 31 U.S.C. § 3730(e), there has been no statutory relevant public disclosure of the "allegations or transactions" in this Complaint. Relators, moreover, would qualify under that section of FCA as "original source" of the allegations in this Complaint, even had such a public disclosure occurred.

17. The Court has subject matter jurisdiction over Defendants' violation of the NYFCA pursuant to 31 U.S.C. § 3732(b) because Defendants' violation of the NY FCA and the

FCA all arise out of a common nucleus of operative facts.

18.     This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, Defendants can be found in, reside and transact business in the Eastern District of New York. Specifically, Defendants own at least eight (8) facilities in New York City and have a main office in Brooklyn.

19.     Venue is proper in this District pursuant to 31 U.S.C. § 3731(a) because Defendants can be found in and transact business in the Eastern District of New York. At all times relevant to this Complaint, Defendants regularly conducted substantial business within the Eastern District of New York, maintained employees and offices in New York City, performed a significant amount of therapy on patients within New York City and sold a significant number of goods within New York City. In addition, statutory violations as alleged herein, occurred in this district.

## THE PARTIES

18.     Zayas and Rojas are citizens of the United States and residents of New York, New York and Bronx, New York, respectively. Relators bring this action for violations of the FCA on behalf of themselves and the United States Government and the sovereign government of New York and the NY FCA.

19.     Zayas was employed with Defendants as a secretary and insurance authorization employee at Defendants' Fort Washington and Washington Heights offices and thus has direct knowledge of the false claims that the Defendants submitted to the federal government.

20.     Rojas was employed by Defendants as a front desk/floater employee at

Defendants' Ft. Washington office and a secretary/insurance authorization employee at Defendants' Bronx office and thus has direct knowledge of the false claims that the Defendants submitted to the federal government.

21.     Relators meet the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B). Specifically, Relators voluntarily disclosed to the government the information that forms the basis of this Complaint prior to any public disclosure under 31 U.S.C. §§ 3730(e)(4)(A).

22.     Defendant Williamsburg Physical Therapy P.C. is an active New York Professional Corporation and, according to the New York State Department of State Division of Corporations, maintains a principal executive office at 240 South 3rd Street, Brooklyn, NY 11211.

23.     Defendant Euro Physical Therapy P.C. is an active New York Professional Corporation and, according to the New York State Department of State Division of Corporations maintains a principal executive office at 240 South 3rd Street, Brooklyn, NY 11211.

24.     Defendants operate at least seven (7) physical therapy offices throughout the city of New York.

25.     To Relators' knowledge, the seven (7) physical therapy offices operate as a single enterprise under a single corporate name sharing management and staff.

26.     To Relators' knowledge, up until in or around 2014, Defendant Euro Physical Therapy P.C. was the entity under which Defendants' seven (7) physical therapy offices[2] were operated under.

---

[2] All operating as Williamsburg Physical Therapy: Williamsburg at 182 Havenmeyer Street, Brooklyn, NY 11211; Washington Heights at 601 West 182nd Street, New York, NY 10033; Fort Washington at 752 Ft. Washington Avenue, New York, NY 10022; Greenpoint at 705 Manhattan Avenue, Brooklyn, NY 11222; Jackson Heights at 37-49 91st Street, Jackson Heights, NY 11372; and Bronx at 32-24 Grand Concourse, Bronx, NY 10458.

27.     To Relators' knowledge, beginning in or around 2014, Defendant Williamsburg Physical Therapy P.C. took over as the entity under which the seven (7) physical therapy offices have been operated under.

28.     Moreover, Williamsburg Physical Therapy P.C. is the entity under which Defendants' PTs and unlicensed Aides and Assistants were paid.

29.     Defendant First Plus Service, Inc. is an active New York Business Corporation and, according to the New York State Department of State Division of Corporations maintains a principal executive office at 76 Manhattan Avenue, Brooklyn, NY 11206.

30.     Defendant First Plus Service, Inc. is the entity from which Defendants' administrative employees, including Relators, were paid and the entity from which Defendants' PTs and unlicensed Aides and Assistants were paid for hours worked in excess of forty (40) in a given workweek.

31.     Defendant A. Klurfeld is the Chief Executive Officer of Williamsburg Physical Therapy P.C. and Euro Physical Therapy P.C. and is a resident of Brooklyn, New York.

32.     Defendant D. Klurfeld is the Chief Executive Officer of First Plus Service, Inc. and is a resident of Brooklyn, New York.

33.     Defendants A. Klurfeld and D. Klurfeld collectively own and operate Defendants Williamsburg, Euro and First Plus.

34.     Defendants are part of a single integrated enterprise (hereinafter referred to as the "Klurfeld Enterprise").

35.     The vast majority of of Defendants' patients are Medicare and/or Medicaid patients.

## APPLICABLE LAW

### I. FEDERAL FALSE CLAIMS ACT

36.     The FCA provides, in pertinent part:

> (a)     Any person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false claim allowed or paid, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $11,000, plus three (3) times the amount of damages which the Government sustains as a result of the act of that person.

> (b)     For purposes of this section, the term "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.

### II. NEW YORK FALSE CLAIMS ACT

37.     The NY FCA became effective in April of 2007 and is modeled after the FCA.

38.     The NY FCA provides, in pertinent part:

> (a)     Any person who: (1) knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local government; (3) conspires to defraud the state or a local government by getting a false claim allowed or paid, shall be liable to the state and local government for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three (3) times the amount of damages which the state and/or local government sustains.

> (b)     For purposes of this section, the term "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate

> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent is required.

39.     The NY FCA imposes liability on any person who knowingly presents a false claim, record or statement to the State of New York or a local government that results in monetary or other damages to the government.

40.     For purposes of the NY FCA, the terms "knowing" and "knowingly" mean that with respect to a claim, or information relating to a claim, a person: (a) has actual knowledge of such claim or information; (b) acts in deliberate ignorance of the truth or falsity of such claim or information; or (c) acts in reckless disregard of the truth or falsity of such claim or information.

## III.    Background on Federal and State-Funded Health Insurance Programs

### A.    Medicare

41.     In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare"), to pay for the cost of certain medical services, including outpatient physical therapy services, for persons 65 and older, and for persons with disabilities. *See* 42 U.S.C. § 1395k(a)(2)(C).

42.     Critical to the continued solvency and viability of the Medicare program is that healthcare providers bill only for services that are actually performed.

43.     The Department of Health and Human Services ("HHS") is responsible for the funding administration and supervision of the Medicare program. The Center for Medicare Services ("CMS") is the division of HHS that is directly responsible for the administration of Medicare. Medicare Part A, which is not at issue here, provides hospital insurance benefits to the elderly and disabled. *See* 42 U.S.C. § 1395c *et seq.* Medicare Part B is a federally subsidized, voluntary insurance program that pays a portion of the cost of certain medical and other health services not covered by the Part A program, including some physical therapy services.

Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance companies to receive, review and pay appropriate claims for outpatient physical therapy services from the Medicare Trust Fund. *See* 42 U.S.C. § 1395h and 42 U.S.C. § 1395u. In this capacity, the insurance carriers act as fiscal intermediaries on behalf of CMS.

44.     To participate in the Medicare program, a healthcare provider must enter into a contract with CMS in which the provider agrees to conform to all applicable statutory and regulatory provisions relating to Medicare payments and reimbursements. *See* 42 U.S.C. § 1395cc. For example, healthcare providers participating in the Medicare program must:

(a) Refrain from making false statements or misrepresentations of material facts concerning payment requests;

(b) Not bill for any services or products that were not performed or delivered in accordance with all applicable policies;

(c) Be fully licensed and/or certified under all applicable state and federal laws to perform the services provided to the recipients;

(d) Comply with the applicable state and federal statutes, policies and regulations;

(e) Not engage in any illegal activities related to the furnishing of services or products to recipients;

(f) Must accept the "allowable charge" as determined by Medicare as full payment for covered services.

*See* 42 U.S.C. § 1395, *et seq.*

45.     At all times relevant to the Complaint, Defendants were participating Medicare providers. Thus, at all times material to this Complaint, Defendants were required to obey all federal and state laws and regulations governing Medicare providers, including the FCA and NY FCA which prohibit: (1) False statements and certifications when applying for any benefit or payment under Medicare laws; and (2) Presenting or causing to be presented any false or

fraudulent claims under Medicare. *See* 42 U.S.C. § 422.504(h)(1).

     **B.**    **Medicaid**

    46.    At all times relevant to the Complaint, Defendants were participating Medicare providers. Thus, at all times material to this Complaint, Defendants were required to obey all federal and state laws and regulations governing Medicare providers, including the FCA and NY FCA which prohibit: (1) False statements and certifications when applying for any benefit or payment under Medicare laws; and (2) Presenting or causing to be presented any false or fraudulent claims under Medicare. *See* 42 U.S.C. § 422.504(h)(1).

    47.    Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aides the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

    48.    Medicaid is a cooperative federal-state public assistance program which is administered by the states.

    49.    Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program.

    50.    Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

    51.    However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards. A state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind. In addition, the state

Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

52.     The New York Medicaid program is administered by the New York State Department of Health ("DOH"). Determinations of enrollee eligibility are made by the fifty-eight (58) county New York Departments of Social Services ("LDSS") and the New York City Human Resources Administration ("HRA").

53.     The Federal Medicaid Assistance Percentage ("FMAP") for the State of New York is currently fifty percent (50%). This means that the federal government provides fifty percent (50%) of the funding for New York Medicaid, and the remaining fifty percent (50%) of the fund is paid by the State of New York.

**C.     Medicare and Medicaid Reimbursement for Physical Therapy Services**

54.     Medicare and Medicaid pay for physical therapy services when the services are rendered by a physician, by a qualified employee of a physician or physician-directed clinic or by a qualified physical therapist in independent practice. 42 C.F.R. § 410.60(c)(1)(ii).

55.     Healthcare providers, including physical therapists, are reimbursed under Medicare or Medicaid only if the healthcare provider assures that: (1) No claim for an item or service is based upon a code that will provide greater payment than the code which is applicable to the item or service actually provided; and (2) Claims submitted for reimbursement do not make false statements or misrepresentations of material facts.

56.     In addition to the limitations named above, Medicare and Medicaid  pay only for outpatient physical therapy provided by qualified personnel. 42 U.S.C. § 1395x(p); 42 C.F.R. § 485.713. Personnel qualified to provide outpatient physical therapy services include licensed physical therapists and licensed physical therapy assistants who act under the supervision of a

licensed physical therapist, and not unlicensed aides. 42 C.F.R. § 484.4; 42 C.F.R. § 485.54(b); 42 C.F.R. § 485.713(c).

57.     In order to bill Medicare or Medicaid for covered physical therapy services, only a licensed physical therapist who applied for and was assigned a unique Medicare provider identification number, or a licensed physical therapist supervised by a physical therapist assigned a unique Medicare provider number can perform the therapy.

58.     A healthcare provider must also certify that it is in compliance with applicable federal and state statutes, rules and regulations. Indeed, CMS conditions payment upon the services being personally provided by, or in some instances, supervised by, the licensed professional who has applied for and received a provider identification number. Medicare and Medicaid regulations expressly provide that all claims for services of providers or suppliers must be signed by the provider or supplier, which in turn certifies that the invoices are in compliance with Medicare and Medicaid laws. 42 C.F.R. § 424.33(b). A knowing failure to comply with such authority renders a claim false where the provider has certified compliance with the applicable authority, even if the provider rendered the service for which it seeks reimbursement.

59.     Medicare and Medicaid do not pay for physical therapy services performed by unlicensed physical therapists, physical therapy aides or for work performed by physical therapy assistants independent of the supervision of a licensed physical therapist.

60.     It is unlawful to routinely waive copayments for Medicare and Medicaid patients under the federal antikickback statute, 42 U.S.C. § 1320a-7b.

61.     At all times relevant to this complaint, Defendants were aware of the above listed statutory requirements for claims submitted to Medicare and Medicaid for payment of physical therapy services.

62.     Despite Defendants' knowledge of these statutory requirements, Defendants routinely and knowingly submitted claims to Medicare Part B and Medicaid for payment that violated one or more of these statutory requirements. For example, Defendants submitted claims that:

- Intentionally contained the names and unique provider identification numbers of licensed physical therapists for services that were performed by unlicensed physical therapist aides or physical therapy asssitants without the supervision of a licensed physical therapist to receive payment for services completed by unlicensed physical therapists;

- Sought reimbursement for covered services (i.e., exercise) which were not provided;

- Routinely waived co-pays of patients whose therapy was covered by Medicare and Medicaid without authorization; and

- Intentionally backdating treatment date on bills submitted to Medicare and Medicaid in order to receive payment for treatment given after the authorization date.

**D.      Certification**

63.     Each and every bill submitted by healthcare providers for Medicare or Medicaid reimbursement is certified by signature of the treating physician or provider.

64.     For ease of use, CMS publishes uniform health insurance claim form 1500.

65.     CMS form 1500, signed by the physician or provider, whether filed electronically or by hard copy via U.S. Mail, contains a certification that the services for which the request for reimbursement being submitted, were "medically indicated and necessary for the health of the

patient and were personally furnished by me or my employee under my personal [direction or supervision]."

## STATEMENT OF FACTS

### I.    DEFENDANTS' PHYSICAL THERAPY BUSINESS

66.    At all relevant times, Defendants have been in the physical therapy business.

67.    Defendants own and operate seven (7) physical therapy offices at the following addresses:

(1) Williamsburg: 182 Havenmeyer Street, Brooklyn, NY 11211 ("Williamsburg Office");

(2) Washington Heights: 601 West 182nd Street, New York, NY 10033 ("Washington Heights Office");

(3) Fort Washington: 752 Ft. Washington Avenue, New York, NY 10022 ("Fort Washington Office");

(4) Greenpoint: 705 Manhattan Avenue, Brooklyn, NY 11222 ("Greenpoint Office");

(5) Boro Park: 1379 54th Street, Brooklyn, NY 11219 ("Boro Park Office");

(6) Jackson Heights: 37-49 91st Street, Jackson Heights, NY 11372 ("Jackson Heights Office"); and

(7) Bronx: 32-24 Grand Concourse, Bronx, NY 10458 ("Bronx Office").

68.    Defendants' seven (7) physical therapy offices (hereinafter "Williamsburg Physical Therapy Offices") are all operated under the corporate name Williamsburg Physical Therapy, P.C. and are doing business as Williamsburg Physical Therapy.

69.    Defendants' Williamsburg Physical Therapy Offices share a common management and are centrally controlled, operated and owned by Defendants.

70.    Moreover, Defendants' Williamsburg Physical Therapy Offices engage in the same fraudulent and unlawful billing policies, practices and procedures.

71.    Defendants offer "free" massages to individuals on the street, have their unlicensed Aides or  and then bill the patients' insurance companies for said massages. As such, several of the Williamsburg Physical Therapy Offices treat patients on a walk-in basis.

72.    Defendants' Williamsburg Physical Therapy Offices each see an average of the following number of patients per day:

(1) Williamsburg: Monday through Friday approximately fifty to sixty (50-60), Saturday approximately twenty to thirty (20-30);

(2) Washington Heights: Monday through Thursday approximately one-hundred (100), Friday approximately eighty (80), Saturday approximately forty (40);

(3) Fort Washington: Monday through Thursday approximately one-hundred (100), Friday approximately eighty (80), Saturday approximately forty (40);

(4) Greenpoint: Three (3) days per week approximately twenty to thirty (20-30) per day (patients by appointment only);

(5) Boro Park: Three (3) days per week approximately twenty-thirty (20-30) per day (patients by appointment only);

(6) Jackson Heights: Monday through Friday, approximately twenty to sixty (20-60);

(7) Bronx: Monday through Friday, approximately eight to forty (8-40).

73.    While Defendants maintain seven (7) physical therapy offices, many of which are open six (6) days a week, they only currently employ four (4) United States licensed physical therapists.

74.    The current licensed physical therapists are as follows: Alvin Orodie, NPI:

1396047015; Alex Klurfeld, NPI: 1073594248; Mary Claire Aribilo, P.T. NYS Lic. # 027025; and Rowel Arguilles.[3]

75.     Formerly, there were licensed physical therapists by the name of Ricardo Baraan and Dennis "Doe."

76.     Insurance companies, including Medicaid and/or Medicare, have only authorized certain of the above-named licensed physical therapists to perform therapy at certain offices. (See Insurance Company/Physical Therapist Approval List, annexed hereto as Exhibit "A")

## II.     DEFENDANTS' FRAUDULENT BILLING PRACTICES

### A.     *Defendants Used Provider Identification Numbers of Licensed Physical Therapists to Bill Medicare for Services Performed by Unqualified Personnel*

77.     At each of Defendants' physical therapy offices, Aides and Assistants performed ultrasounds, physical therapy massage, electrical stimulation and other physical therapy on patients of all ages and conditions. (See e.g., Picture of Aide performing therapy on a young child, attached hereto as Exhibit "C")

78.     Defendants' PTs (license numbers provided above) are often out of the office while Defendants continue to bill Medicare and/or Medicaid as if the PTs are performing the therapy and/or directly supervising the Aides or Assistants.

79.     For example, while PT/Defendant Alex Klurfeld never evaluates patients, he signs physical therapy progress notes pages as if he did evaluate the patients in order to submit these notes to Medicare and/or Medicaid for payment. In fact, Klurfeld only comes by the offices to pick up co-payments which were paid in cash or check (the majority are either cash or check) and observe how the office is running and does not treat patients or supervise Aides or Assistants.

---

[3] PT Alvin Orodie and Mary-Claire Arbilio were compensated by an agency, Medical Dynamic Systems Incorporated, for their work performed at Williamsburg Physical Therapy.

80. Moreover, while PT Arguilles was in the Phillippines from in or around November 12, 2015 until in or around January 18, 2016, Defendants continued to send bills to Medicare and/or Medicaid that he had pre-signed or forged for physical therapy that was performed by unlicensed Aides or Assistants.

81. Furthermore, while PT Aribilio was on maternity leave from in or around February 2015 through in or around May of 2015, PT Aribilio pre-signed blank progress notes for Aides or Assistants to fill out without her supervision which were later submitted to Medicaid and/or Medicare for payment. (See pre-signed blank progress notes, attached hereto as Exhibit "B.")

82. In addition, beginning on January 15, 2016 while PT Orodie was in the Philipines, an unlicensed Aide, Nina Tuguinay, was writing all of the physical therapist progress notes and forging PT Orodie's name based on the directions he left for her and other Aides/Assistants to forge his signature on progress notes which would later be submitted to Medicare and/or Medicaid for payment. (See Orodie signature directions attached hereto as Exhibit "D")

83. For the first month that the Bronx Office was open from October 2015 to November 2015 there was no PT on staff, however, the Bronx Office would continue to bill Medicare and/or Medicaid for approximately twenty-five (25) patients per day for physical therapy which was performed by Aides or Assistants without direct supervision by a PT. Specifically, PT Aribilio would sign the progress notes as if she had performed the physical therapy at either the Ft. Washington or Washington Heights Office.

84. Upon information and belief, the following PTs were out of the office on the following dates: November 12, 2015 PT Aribilio and PT Arguilles out; November 20, 2015 PT Aribilio out; December 14, 2015 PT Aribilio out; December 30, 2015 PT Orodie out; and

December 31, 2015 PT Aribilio out. As such, any physical therapy performed on these dates was performed by an unlicensed Aide or Assistant but was submitted to Medicaid or Medicare as though it was performed by a licensed PT.

85.    While Defendants' PTs are often not present while Aides or Assistants perform physical therapy, Defendants require them to pre-sign progress notes or co-sign notes which they have not reviewed for submission to Medicaid and/or Medicare for billing. (See, e.g., Exhibit "B," pre-signed blank progress notes).

86.    When PTs are not present at one of Defendants' Williamsburg Physical Therapy Offices, Aides will perform the initial evaluation without PT supervision.

87.    While PTs rarely see patients, Defendants bill Medicare, Medicaid and other insurance companies based on whichever offices and PT Medicare, Medicaid or the other insurance company has approved. (See Exhibit "A," Insurance Company/Physical Therapist Approval List)

88.    In or around 2012-2013, a PT named Eric Almendrala Oliver worked for Defendants at their Washington Heights Office. When he witnessed the fraudulent practices, however, he left Defendants' employ because he was concerned that he would lose his license if he participated in their fraudulent practices.

89.    In Defendants' Williamsburg Office, despite the fact that they typically treat fifty to sixty (50-60) patients per day Monday through Friday and twenty to thirty (20-30) on Saturdays, they typically only have one (1) PTs on staff.

90.    In Defendants' Washington Heights Office, despite the fact that they typically treat one hundred (100) patients per day Monday through Thursdayeighty (80) patients per day on Friday and forty (40) on Saturdays, they typically only have one (1) PT on staff Monday

through Friday and no PTs on staff on Saturdays ( and, as a result, all patients who come in on Saturdays are logged in as if they came in on Monday).

91.     In Defendants' Fort Washington Office, despite the fact that they typically treat one hundred (100) patients per day Monday through Thursdayeighty (80) patients per day on Friday and forty (40) on Saturdays, they typically only have one (1) PT on staff Monday through Friday and only one (1) PT on staff every other Saturday.

92.     In Defendants' Greenpoint Office, despite the fact that they typically treat twenty to thirty (20-30) patients per day, three (3) days per week, they typically only have one (1) PT on staff.

93.     In Defendants' Boro Park Office, despite the fact that they typically treat twenty to thirty (20-30) patients per day, three (3) days per week, they typically only have one (1) PT on staff.

94.     In Defendants' Jackson Heights Office, despite the fact that they typically treat twenty to sixty (20-60) patients per day Monday through Friday, they typically only have one (1) PT on staff.

95.     In Defendants' Bronx Office, despite the fact that they typically treat eight to forty (8-40) patients per day Monday through Friday, they typically only have one (1) PT on staff.

96.     Defendants are clearly aware that they do not have enough physical therapists on staff at their offices to perform all physical therapy, and, when Defendants'Washington Heights Office was audited by Medicare in or around 2011 and 2012, Defendants removed certain Medicare charts and call logs from the office, covered certain exposed charts, required Zayas, a PT by the name of Vincent Caisip and other employees to edit charts prior to the audit and

required Zayas to be untruthful regarding the number of physical therapists who worked in the office on a daily basis.

97.     Defendants used the following CPT codes for billing Medicare and/or Medicaid for physical therapy performed by Aides or Assistants: 97001 for an evaluation, 97002 for a re-evalutaion, 97110, 97014, 97112, 97140, 97035 for an ultrasound and 97018 for paraffin treatment.

98.     Affinity Medicare/Medicaid has only authorized PT Arguilles to treat patients in Ft. Washington, however, unlicensed aides often see patients in Washington Heights or the Bronx and PT Arguilles signs their notes. In addition to being severely understaffed for the number of patients who come in to see licensed physical therapist, the licensed physical therapists are often out of the office on vacation. When a licensed physical therapist is out of the office, there is no physical therapist on staff at that office for this time, meaning that whichever patients come to the office on that day do not see a licensed physical therapist.

99.     While PT Alex Klurfeld never sees patients, he regularly signs progress notes for therapy performed by unlicensed Aides or Assistants. Moreover, PT Klurfeld regularly signs progress notes and submits claims to insurance companies who have only authorized payment for therapy performed by him, although the therapy is often performed by unlicensed Aids or Assistants.

100.     For the rare occasion when PTs do actually perform physical therapy, they often submit claims under other PTs at other offices. For example, for the first year of a PT's employment with Williamsburg PT, the new PT is not a provider with any insurance company (including Medicaid, Medicare and MCOs) and all evaluations and notes are signed by PT Klurfeld as though he performed the evaluation when, in fact, he was not present for these

evaluations. Moreover, since Williamsburg PT only has approval of certain PTs for certain offices, when a patient who has a certain health insurance comes into a separate office with a separate PT

### B. Backdating Treatment

101. When clients would receive therapy after the approval time period by Medicare and/or Medicaid expired, Defendants would instruct Relators and their other employees to back-date the physical therapy date so that it appeared that the client came in during the approval period.

102. Prior to Defendants' switch to Web PT in or around July 2015, Defendants instructed their employees to write dates in erasable pen for the sole purpose of back-dating treatment.

103. Once Defendants' switched to using Web PT, they would have to amend the entry to back-date it.

104. By back-dating treatment which occurred after the approval date, Defendants are being paid for unapproved treatment.

### C. Charging for Services Not Provided

105. While the majority of Defendants' patients decline to perform certain cardiovascular exercises at their Williamsburg Physical Therapy Offices, they routinely charge Medicare and/or Medicaid for the cardiovascular exercises.

### D. Routinely Waiving Co-Payments for Medicare and/or Medicaid Clients

106. Defendants routinely waive co-payments for their Medicare and/or Medicaid clients who do not necessarily have a financial hardship or uncollectability in violation of the federal antikickback statute, 42 U.S.C. § 1320a-7b.

24

### III.    RELATORS' EMPLOYMENT WITH DEFENDANTS

107.    Relator Zayas worked for Defendants from on or around March 25, 2009 through on or around February 5, 2016 (the "Zayas Employment Period").

108.    From the beginning of the Zayas Employment period until in or around 2011, Zayas worked as a secretary in Defendants' Washington Heights Office.

109.    In or around 2011, Zayas was promoted to the insurance department where she worked as an insurance authorization employee throughout the remainder of her employment period.

110.    Zayas was transferred to Defendants' Fort Washington Office from in or around 2013 until in or around 2015.

111.    In or around 2015, Zayas was transferred back to Defendants' Washington Heights Office, where she worked for the remainder of the Zayas Employment Period.

112.    Prior to working for Defendants, Zayas performed a significant amount of online research regarding the laws regarding physical therapy practices and billing requirements for Medicare and/or Medicaid.

113.    Shortly after Zayas began working for Defendants, she became highly suspicious that Defendants' billing practices were unlawful and fraudulent. Zaya did more research and was able to confirm her suspicions that Defendants' practices were fraudulent.

114.    After confirming that Defendants' practices were fraudulent, Zayas refused to engage in any fraudulent practices such as back-dating physical therapy records.

115.    Defendants retaliated against Zayas for refusing to fraudulently back-date physical therapy records by humiliating her in front of her co-workers and calling her "rebellious and confrontational."

116.    Defendants' retaliation forced Zayas to resign her position with Defendants.

117.    <u>Relator Rojas</u> worked for Defendants from in or around March 2015 until in or around March 11, 2016 ("Rojas Employment Period").

118.    From the beginning of the Rojas Employment Period until in or around September 2015, Rojas worked at Defendants' Fort Washington Office as a front desk/floater employee.

119.    From in or around October 2015 until the end of the Rojas Employment Period, Rojas worked in Defendants' Bronx Office as the only secretary in the office and as an insurance authorization/eligibility employee.

120.    Throughout her employment with Defendants, Rojas recognized that Defendants' practices were unlawful.

121.    Importantly, she noticed that Aides and unlicensed Assistants were performing physical therapy without the supervision of a PT.

122.    Finally, Defendants specifically asked Rojas to back-date certain treatment notes so that payment would not be rejected by Medicare and/or Medicaid. When Rojas refused, Defendants harassed and retaliated against her by refusing to provide her assistance when she needed it. The retaliation became so severe that Rojas resigned her position with Defendants.

## IV.    DAMAGE ESTIMATES

123.    Relators estimate that Medicare and Medicaid pay approximately one hundred and seventy five dollars ($175) per physical therapy session.

124.    Moreover, Relators estimate that, on a weekly basis: the Williamsburg Office would treat approximately 300 patients; the Washington Heights Office would treat approximately 210 patients; the Fort Washington Office would treat approximately 210 patients; the Greenpoint Office would treat approximately 75 patients; the Boro Park Office would treat

approximately 75 patients; the Jackson Heights Office would treat approximately 200 patients; and the Bronx Office would treat approximately 120 clients per week.

125.   In total, the seven (7) Williamsburg Physical Therapy Offices would treat approximately 1,190 patients per week. As such, Defendants would receive approximately $208,250 per week from insurance companies, including Medicare and Medicaid, for performing physical therapy on patients. This amounts to $10,829,000 per year, and a total of $100,829,000 for the entire ten (10) year statutory period.

126.   Relators believe the vast majority of Defendants' patients are on Medicare or Medicaid, therefore a large percentage of the $100,829,000 was paid to Defendants by Medicare and/or Medicaid as a result of Defendants' fraudulent practices.

127.   Defendants charged Medicare or Medicaid seventy-five dollars ($75) for Defendants' patients to "exercise," even though they rarely performed exercise prior to their physical therapy sessions.

128.   Based on Relators' estimate that Defendants' seven (7) Williamsburg Physical Therapy Offices would treat approximately 1,190 patients per week, they would receive approximately $89,250 per week, $4,641,000 per year and $46,441,000 over the entire ten (10) year statutory period.

129.   Relators believe that the vast majority of the $46,441,000 was paid by Medicare and/or Medicaid to Defendants and was fraudulently obtained.

130.   Upon information and belief, a substantial portion of Defendants' business is from Medicaid or Medicare, and a substantial portion of Defendants' income is derived from Medicaid or Medicare.

131.   Upon information and belief, each Defendant has an annual net income or sales in

excess of one million dollars ($1,000,000.00).

109.  Upon information and belief, for at least the past ten (10) years, Defendants have engaged in the above-described scheme.

110.  Upon information and belief, each Defendant was purposely engaging in the above-described scheme in order to bill Medicaid and/or Medicare for physical therapy sessions performed by unlicensed Aides and Assistants and for exercises that were not performed.

111.  Relators have estimated that Defendants' permitting unlicensed Aides and Assistants to perform physical therapy, improper backdating treatment, improper waiving of co-pays and billing to exercises which were not performed has allowed them to defraud Medicaid and/or Medicare into paying them in excess of $147,270,000 for the previous ten (10) years, which would be subject to treble damages under the FCA. In addition, each document which was fraudulently presented to the United States would be a false claim subject to an additional $5,500 to $11,000 per false claim in penalties, or (assuming 2,380 false claims were presented per month and an average of $8,250 penalty per false claim) approximately $10,210,200,000 in claims to the New York State or local governments would be a false claim subject to an additional $6,000 to $12,000 per false claim in penalties, or (assuming 2,380 false claims were presented per week and an average $9,000 penalty per false claim) approximately $11,138,400,000 over the last ten (10) years.

112.  Therefore, inclusive of all penalties and treble damages, Relators estimate that Defendants owe the United States and New York State in or around $11.18 billion.

## V.    PATIENT HEALTH CONCERNS

113.  One of the Aides who regularly performs physical therapy on patients without PT supervision, Jennifer Amalfi, had burned several patients with the ultrasound hot packs.

114. Patients regularly called the office and spoke with Relators or their coworkers to complain about being more sore after their massage with the unlicensed physical therapy aides.

115. Moreover, patients regularly call the office to complain that physical therapy was not helping at all.

## FIRST CAUSE OF ACTION
## VIOLATION OF FEDERAL FALSE CLAIMS ACT

116. Relators incorporate herein by reference the preceding paragraphs as though fully set forth herein.

117. This is a civil action brought by Relators, on behalf of the United States of America, against Defendants under the federal False Claims Act, 31 U.S.C. § 3729(a)(1), (2).

118. Defendants knowingly presented, and/or caused to be presented claims for payment for: (1) physical therapy performed by unlicensed and unapproved Aides and Assistants; (2) exercises not performed; (3) physical therapy sessions after the approval date; and (4) physical therapy when the patients' co-pay was waived to the federally-funded New York health insurance programs.

119. The claims Defendants submitted relating to: (1) physical therapy performed by unlicensed and unapproved Aides and Assistants; (2) exercises not performed; (3) physical therapy sessions after the approval date; and (4) physical therapy when the patient's co-pay was waived were false claims submitted in violation of the FCA. Defendants knew, or acted in reckless disregard, that they were ineligible for the payments demanded due to the fact that: (1) physical therapy was performed by unlicensed and unapproved Aides and Assistants; (2) exercises were not performed; (3) physical therapy sessions were held after the approval date; and (4) patients' co-payments were routinely waived.

120. Claims submitted by Defendants to federally-funded health insurance programs

(including Medicare and Medicaid) for physical therapy and exercises constitute violations of the federal False Claims Act, 31 U.S.C. § 372(a)(1).

121.    Defendants, through their concerted efforts to carry out their systematic scheme to obtain fraudulent payments from Medicaid and Medicare, caused to be made or used false records or statements, including but not limited to billing sheets and internal records to get false or fraudulent payments in violation of the federal False Claims Act, 31 U.S.C. § 372(a)(1).

122.    All of Defendants' conduct described in the Complaint was knowing, as that term is used in the federal False Claims Act.

## SECOND CAUSE OF ACTION
## NEW YORK FALSE CLAIMS ACT

123.    Relators incorporate herein by reference the preceding paragraphs as though fully set forth herein.

124.    This is a civil action brought by Relators, on behalf of the State of New York, against Defendants under the New York False Claims Act, N.Y. State Fin. Law § 187, *et seq.*

125.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented a false or fraudulent claim for payment or approval to the State of New York, the City of New York and/or other state or local government agencies, in violation of N.Y. State Fin. Law § 189(1)(a).

126.    The claims Defendants submitted relating to: (1) physical therapy performed by unlicensed and unapproved Aides and Assistants; (2) exercises not performed; (3) physical therapy sessions beyond the approval date; and (4) physical therapy when the patients' co-pay was waived were false claims submitted in violation of NYFCA § 189(1)(a). Defendants knew, or acted in reckless disregard, of the fact that they were ineligible for payments demanded due to

30

the fact that: (1) physical therapy was performed by unlicensed and unapproved Aides and Assistants; (2) exercises were not performed; (3) physical therapy sessions were held beyond the approval date; and (4) patients' co-payments were routinely waived.

127.   Claims submitted by Defendants to New York state-funded health insurance programs (including Medicare and Medicaid) relating to all physical therapy sessions and exercises billed at any of the seven (7) Williamsburg Physical Therapy Offices, constitute violations of the NYFCA.

128.   Defendants, through their concerted efforts to carry out their systematic scheme to obtain fraudulent payments to Medicaid and Medicare, caused to be made or used false records or statements, including billing sheets and internal records to get false or fraudulent payments in violation of the NYFCA.

129.   As a result of Defendants' actions, set forth above, the state of New York, the city of New York and/or other state and local government agencies have been and continue to be severely damaged.

**THIRD CAUSE OF ACTION**
**FEDERAL FALSE CLAIMS ACT - RETALIATION**

130.   Relators incorporate herein by reference the preceding paragraphs as though fully set forth herein.

131.   The FCA, 31 U.S.C. § 3730(h) provides as follows:

> Any employee who is discharged, demoted, suspended, threatened, *harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer* because of lawful acts done by the employee on behalf of the employee or in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority

status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

132.   For the reasons stated above, Defendants violated FCA Section § 3730(h) by retaliating against Relators by harassing them, hindering their employment and otherwise discriminating against them because of their refusal to participate in Defendants' unlawful acts in violation of an action under the FCA and NY FCA, and Relators are entitled to all relief necessary to make them whole.

## FOURTH CAUSE OF ACTION
## NEW YORK FALSE CLAIMS ACT – RETALIATION

133.   Relators incorporate herein by reference the preceding paragraphs as though fully set forth herein.

134.   Defendants submitted false claims for payment to Medicare and/or Medicaid as set forth herein, in violation of the NY FCA.

135.   Relators' foregoing conduct was an effort to stop one or more violations of the NY FCA.

136.   By the foregoing acts, Defendants threatened, harassed and in other manner discriminated against Relators in the terms and conditions of employment, or otherwise harmed or penalized Relators because of lawful acts done by Relators protected by the NY FCA, in violation of Section 191 of the False Claims Act.

137.   As a result of Defendants' conduct, Relators are entitled to all relief that makes them whole.

## PRAYER FOR RELIEF

Wherefore Relators respectfully request that this Court grant the following relief:

a.     That Defendants be ordered to cease and desist for submitting or causing to be submitted any more false claims;

b.     That judgment be entered in Relators' favor and against Defendants in the amount equal to three (3) times the amount of damages sustained by the United States as a result of Defendants' actions;

c.     A civil penalty of $11,000 for each violation of the federal False Claims Act.

d.     25% of the proceeds in this action if the United States elects to intervene, and 30% of the proceeds of this action if the United States elects not to intervene;

e.     That judgment be entered in Relators' favor and against Defendants in the amount equal to three (3) times the amount of damages sustained by the State and local governments of New York plus a penalty of not less than six thousand dollars ($6,000) and not more than twelve thousand dollars ($12,000) as provided by NY Fin. Law §§ 187, *et seq.*;

f.     That Relators be awarded the maximum allowed pursuant to NY Fin. Law §§ 187, *et seq.*(i.e., 25% if the State of New York elects to intervene, and 30% if it does not);

g.     That Relators be awarded all damages available pursuant to 31 U.S.C. § 3730(h) as a result of Defendants' retaliation against them, including but not limited to compensation for any special damages as a result of the harassment, including damages for emotional distress;

h.     An award of Relators' costs and expenses of this action together with Relators' attorneys' and expert fees; and

i.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Relator hereby demands a trial by jury on all questions of fact raised by the Complaint.

Dated: New York, New York
       August 29, 2016

PELTON GRAHAM LLC

By: _____

Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
Alison L. Mangiatordi (AL 1020)
111 Broadway, Suite 1503
New York, New York 10006
Telemarcphone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Relators*




30% PCW     100% Recycled

## Insurances

For

## BRONX OFFICE

Faxed to Alexandra on 02/29/16

| Insurance | Provider | Corporation | Provider/Group ID | Location |
|---|---|---|---|---|
| Health First | Alvin Orodio NPI: 1396047015 | Williamsburg Tax ID: 200648216 NPI:1053490599 | Group I.D.: PT032435-A14 | Bronx |
| Fidelis | Alvin Orodio NPI: 1396047015 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D.: 140430000182 | Bronx |
| CMO/HIP | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | License #: 017-209 Pris#: 1220419P | Bronx |
| WellCare | Alvin Orodio NPI: 1396047015 | Euro Tax ID:113476609 NPI: 1003837253 | Group I.D.: 200375 | Washington Heights |
| Affinity | Alvin Orodio NPI: 1396047015 | Williamsburg Tax ID: 200648216 NPI:1053490599 | Provider I.D.: 201325700034 | Bronx |
| HIP | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | License #: 017-209 Pris#: 1220419P | Bronx |
| MetroPlus | Alvin Orodio NPI: 1396047015 | Williamsburg Tax ID: 200648216 NPI:1053490599 | Provider I.D.: 00324350 | Bronx |
| Amerigroup | Alvin Orodio NPI: 1396047015 | Williamsburg Tax ID: 200648216 NPI:1053490599 | Provider I.D.: 01606322 | Bronx |
| 1199 | Alvin Orodio NPI: 1396047015 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D: SEIU139096 | Bronx |

| | | | | |
|---|---|---|---|---|
| **GHI** | **Alvin Orodio** NPI: 1396047015 | **Euro** Tax ID:113476609 NPI: 1003837253 | **Group I.D.:** 6699528 | Bronx |
| **United Health Care-Community** | **Alvin Orodio** NPI: 1396047015 | **Williamsburg** Tax ID: 200648216 NPI:1053490599 | **Provider I.D.:** 100343728801 | Bronx |
| **United Health Care-Commercial** | **Alex Klurfeld** *NPI:*1073594248 | **Euro** Tax ID:113476609 NPI: 1003837253 | **Provider I.D.:** 2174734 | Fort Washington |
| **United Health Care-Medicare** | **Alex Klurfeld** *NPI:*1073594248 | **Euro** Tax ID:113476609 NPI: 1003837253 | **Provider I.D.:** 11-3476609 | Fort Washington |
| **United Health Care-Medicaid/ Child Health Plus/Family Health Plus** | **Alex Klurfeld** *NPI:*1073594248 | **Euro** Tax ID:113476609 NPI: 1003837253 | **Provider I.D.:** 100217473402 | Fort Washington |
| **Medicare** | **Alvin Orodio** NPI: 1396047015 | **Williamsburg** Tax ID:200648216 NPI:1053490599 PTAN:Q4W4P1 | **Provider I.D.:** A400105256 | Bronx |
| **Blue Cross/ Blue Shield** | **Alex Klurfeld** *NPI:*1073594248 | **Euro** Tax ID:113476609 NPI: 1003837253 | **Provider I.D:** Q334B3 / QGWCF | Washington Heights |
| **VNS Choice Select-Medicare** | **Alvin Orodio** NPI: 1396047015 | **Williamsburg** Tax ID: 200648216 NPI:1053490599 | **Provider I.D.:** REH002594-4 | Bronx |
| **Medicaid** | **Alvin Orodio** NPI: 1396047015 | **Williamsburg** Tax ID: 200648216 NPI:1053490599 | **Provider I.D:** 03300543 **OR** Group 02581157 | Bronx |

| Oxford | Alex Klurfeld<br>*NPI:*1073594248 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider I.D.:<br>P640739 | Bronx |
|---|---|---|---|---|
| Magnacare | Alex Klurfeld<br>*NPI:*1073594248 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider I.D.:<br>11-3476609 | Bronx |
| Elderplan | Alvin Orodio<br>NPI: 1396047015 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider I.D.:<br>PH67071 | Bronx |
| Aetna-<br>POS/PPO/EPO/<br>HMO | Alex Klurfeld<br>*NPI:*1073594248 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider I.D.:<br>0007286120 | Bronx |
| Orthonet-<br>Aetna | Alvin Orodio<br>NPI: 1396047015 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider I.D.:<br>0050606 | Bronx |
| Orthonet-<br>Cigna | Alvin Orodio<br>NPI: 1396047015 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider I.D.:<br>0050606 | Bronx |
| Orthonet-<br>US Family<br>Health Plan | Alvin Orodio<br>NPI: 1396047015 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider I.D.:<br>0050606 | Bronx |
| Orthonet-<br>Health Net | Alex Klurfeld<br>*NPI:*1073594248 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider I.D.:<br>0050605 | Washington<br>Heights |
| The Empire<br>Plan/ NYSHIP/<br>MPN | Alex Klurfeld<br>*NPI:*1073594248 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Group NPI:<br>1003837253 | Washington<br>Heights |
| Guildnet | Alvin Orodio<br>NPI: 1396047015 | Williamsburg<br>Tax ID: 200648216<br>NPI:1053490599 | Group Tax I.D.:<br>200648216 | Bronx |
| SENIOR WHOLE<br>HEALTH | Alvin Orodio<br>NPI: 1396047015 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider/TID #<br>113476609 | Bronx |

| Liberty Health Advantage | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D.: 113476609KA01 | Washington Heights |
|---|---|---|---|---|
| Access Medicare | Alvin Orodio NPI: 1396047015 | Williamsburg Tax ID: 200648216 NPI:1053490599 | Provider I.D.: P06810BZZA01 | Bronx |
| Center Light Healthcare | Alvin Orodio NPI: 1396047015 | Euro Tax ID:113476609 NPI: 1003837253 | Group Tax I.D.: 113476609 | Bronx |
| GHI HMO | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | Group I.D.: 000000120781 | Bronx |
| Multiplan | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D.: 11-3476609 OR P61217247 | Fort Washington |
| PHCS/ Guardian | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D.: 11-3476609 OR 457009 | 240 South 3rd St. |
| Railroad Medicare | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D.: 650021195 PTAN: DG2613 | 240 South 3rd St. |
| Horizon Health Care | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D.: 11-3476609 | 240 South 3rd St. |
| ACS (Federal Employee's Work Comp) US Dept. of Labor | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D.: 107984201 | 240 South 3rd St. |
| Health Net | Alex Klurfeld NPI:1073594248 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D.: 5C7313 | 240 South 3rd St. |
| AGEWELL | Alvin Orodio NPI: 1396047015 | Euro Tax ID:113476609 NPI: 1003837253 | Provider I.D.: 11-3476609 | Bronx |

## Workman Comp. And No Fault

| Provider | Corporation | Location |
|---|---|---|
| Alvin Orodio<br>NPI: 1396047015 | Williamsburg<br>Tax ID: 200648216<br>NPI:1053490599 | Bronx |

*** For ACS (Federal Employee's Work. Comp.)****

| Alex Klurfeld<br>NPI: 1073594248 | Euro<br>Tax ID:113476609<br>NPI: 1003837253 | Provider I.D.:<br>107984201 | 240 South 3rd St. |
|---|---|---|---|

## Out of Network

| Provider | Corporation | Location |
|---|---|---|
| Alvin Orodio<br>NPI: 1396047015 | Williamsburg<br>Tax ID: 200648216<br>NPI:1053490599 | Bronx |




30% PCW          100% Recycled

## Physical Therapy Progress Notes

PATIENT'S NAME: _____     DOB:_____

DATE:_____

S: _____

O: _____

TREATMENT:

☐ HP/ CP/ Paraffin on_____     ☐ ULTRASOUND on_____

☐ Electrical Stimulation on _____     Parameters: _____w/cm 2 @ _____ MHz

○ TENS  ○ Russian  ○ IFC     ○ Pulsed          ○ Continuous

☐ MASSAGE on _____     ☐ MANUAL THERAPY on _____ .

☐ Neuromuscular Re- education_____

☐ GAIT TRAINING _____

☐ THERAPEUTIC ACTIVITIES _____

☐ THERAPEUTIC PROCEDURE:

○ UBE _____     ○ Pulley _____     ○ Isometric Ex _____

○ Bicycle _____     ○ Back Extension Ex. _____     ○ Theraband Ex_____

Others: _____

Total Treatment Time:_____mins.     Timed Code Treatment Minutes: _____ mins.

_____

P: _____

PROVIDER STAMP & SIGNATURE:_____

DATE:_____

S: _____

O: _____

TREATMENT:

☐ HP/ CP/ Paraffin on_____     ☐ ULTRASOUND on_____

☐ ectrical Stimulation on _____     Parameters: _____w/cm 2 @ _____ MHz

○ TENS  ○ Russian  ○ IFC     ○ Pulsed          ○ Continuous

☐ MASSAGE on _____     ☐ MANUAL THERAPY on _____

☐ Neuromuscular Re- education _____

☐ GAIT TRAINING_____

☐ THERAPEUTIC ACTIVITIES _____

☐ THERAPEUTIC PROCEDURE:

○ UBE _____     ○ Pulley _____     ○ Isometric Ex _____

○ Bicycle _____     ○ Back Extension Ex._____     ○ Theraband  Ex_____

Others: _____

Total Treatment Time:_____mins.     Timed Code Treatment Minutes:_____ mins.

A: _____

P: _____

PROVIDER STAMP & SIGNATURE:_____ . _____

30% PCW 100% Recycled



 **Fernando Infante**

Cover Photos · Monday at 10:37pm ·

View Full Size · More Options






FOR IE, RE, NOTES

1 YOU MAY USE THESE
PAPERS w/ MY SIGNATURE

2. PUT INSIDE THE PRINTER
UPSIDE DOWN AS SHOWN

Alvin Orodio P.T.
NYS Lic. # 032435